## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| DONALD DOYLE, | CIVIL ACTION |
| Plaintiff, | |
| v. | COMPLAINT `1:17-cv-08667` |
| ALLY FINANCIAL, INC. a/k/a ALLY FINANCIAL a/k/a BLUEYIELD a/k/a BLUEHARBOR FINANCIAL a/k/a CLEARLANE FINANCIAL SERVICES, | JURY TRIAL DEMANDED |
| Defendant. | |

## <u>COMPLAINT</u>

NOW COMES the Plaintiff, DONALD DOYLE ("Plaintiff"), by and through one of his attorneys, James C. Vlahakis of Sulaiman Law Group, Ltd., and brings this civil action as Class Action Complaint on behalf of himself, and a nationwide class of similarly situated individuals, pursuant to Federal Rule of Civil Procedure ("FRCP") 23(a), 23(b)(2) and 23(b)(3) against Defendant, ALLY FINANCIAL, INC. a/k/a ALLY FINANCIAL a/k/a BLUEYIELD a/k/a BLUEHARBOR FINANCIAL a/k/a CLEARLANE FINANCIAL SERVICES (individually and collectively referreed to as"Ally") as follows:

### PARTIES, SUBJECT MATTER JURISDICTION AND VENUE PARTIES

1.     Plaintiff is bring this civil action pursuant to the Telephone Consumer Protection Act, 47 U.S.C. §227, et seq. ("TCPA") and the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1 et seq. ("ICFA").

2.     Plaintiff is a consumer and natural person over 18-years-of-age who, at all times relevant, resided in the Northern District of Illinois.

1

3.      Plaintiff is a "person" as defined by 47 U.S.C. §153(39) of the TCPA.

4.      Ally is a Delaware Corporation with its principal place of business located at 440 South Church Street, Charlotte, North Carolina 28202.

5.      Ally is a "person" as defined by 47 U.S.C. §153(39) of the TCPA.

6.      Ally is engaged in the business of collecting or attempting to collect, directly or indirectly, debts owed or due or asserted to be owed or due using the mail and telephone, including consumers in the State of Illinois.

7.      Ally's Illinois registered agent is CT Corporation System located at 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

8.      Subject matter jurisdiction is conferred upon this Court by the TCPA and 28 U.S.C. §§1331 and 1337, as the action arises under the laws of the United States.

9.      Venue is proper in this Court pursuant to 28 U.S.C. §1391 as Ally conducts business in the Northern District of Illinois and all of the events or omissions giving rise to the claims occurred within the Northern District of Illinois.

10.     The Court has supplemental jurisdiction over the state law ICFA claim under 28 U.S.C.§1367.

### SUMMARY OF THE TCPA

11.     Section (b)(1)(A)(iii) of the TCPA makes it unlawful to make any call to cellular telephone using any "automated telephone dialing system" or an "artificial or prerecorded voice" without the consent of the person being called.

12.     Section 227(a)(1) of the TCPA defines as "automated telephone dialing system" ("ATDS") to mean "equipment which has the capacity (A) to store or produce number to be called, using a random or sequential number generator; and (B) to dial such numbers."

2

13. The Federal Communications Commission ("FCC") has declared that a "predictive dialer" is an ATDS

14. The Court may take judicial notice that the FCC released a Report and Order on July 3, 2003 ("2003 FCC Order").

15. The 2003 FCC Order is at https://apps.fcc.gov/edocs_public/attachmatch/FCC-03-153A1.pdf

16. The 2003 FCC Order defined a predictive dialer as follows:

A predictive dialer is an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that "predicts" the time when a consumer will answer the phone and a telemarketer will be available to take the call. Such software programs are set up in order to minimize the amount of downtime for a telemarketer. In some instances, a consumer answers the phone only to hear "dead air" because the dialer simply hangs up when no telemarketer is free to take the call.

2003 FCC Order at fn. 31.

17. The 2003 FCC Order explains how predictive dialers can be "set" to call consumers:

Each telemarketing company can set its predictive dialer software for a predetermined abandonment rate (i.e., the percentage of hang-up calls the system will allow). The higher the abandonment rate, the higher the number of hang-up calls. High abandonment rates increase the probability that a customer will be on the line when the telemarketer finishes each call. It also, however, increases the likelihood that the telemarketer will still be on a previously placed call and not be available when the consumer answers the phone.

2003 FCC Order at fn. 32.

18. The 2003 FCC Order discussed how predictive dialers attempt "to 'predict' the average time it takes for a consumer to answer the phone."

19. Paragraph 146 of the 2003 FCC Order states:

Predictive dialers initiate phone calls while telemarketers are talking to other consumers and frequently disconnect those calls when a telemarketer is unavailable

3

to take the next call. In attempting to "predict" the average time it takes for a consumer to answer the phone and when a telemarketer will be free to take the next call, predictive dialers may either "hang-up" on consumers or keep the consumer on hold until connecting the call to a sales representative, resulting in what has been referred to as "dead air."

(footnote omitted).

20.     Paragraph 91 of the 2003 FCC Order discussed how the use of predictive dialers result in "dead air" or hang-ups:

the widespread use of predictive dialers now results in many "dead air" or hang-up calls in which consumers do not even have the opportunity to make a do-not-call request. Such calls are particularly burdensome for the elderly and disabled consumers.

21.     Paragraph 8 of the 2003 FCC Order discussed how predictive dialers "frequently abandon calls before a telemarketer is free to take the next call." 2003 FCC Order, Paragraph 8 (footnotes omitted).

22.     The Court may take judicial notice that the FCC released a "Notice of Proposed Rulemaking and Memorandum Opinion and Order" ("2002 FCC Order") on September 18, 2002. The 2002 FCC Order can be found at https://apps.fcc.gov/edocs_public/attachmatch/FCC-02-250A1.pdf

23.     The 2002 FCC Order described the number and types of consumer complaints that it had received regarding "autodialers" and "predictive dialers":

In 1991, the Commission received a total of 757 complaints regarding calls placed to subscribers by autodialers. From June 2000 to December 2001, the Commission received over 1,500 inquiries about predictive dialing alone. In addition, the consumer alert titled "Predictive Dialing: Silence on the Other End of the Line" has received over 16,000 hits on the Commission's website since the alert was posted in February of 2001.

2002 FCC Order, ¶ 26 (footnote omitted).

4

24.     The 2002 FCC Order explained how predictive dialers result in "disconnected" calls:

> In addition to automatically dialing numbers, predictive dialers are set up to "predict" the average time it takes for a consumer to answer the phone and when a telemarketer will be free to take the next call. When a consumer answers the telephone, a predictive dialer transfers the call to an available telemarketer. When a predictive dialer simultaneously dials more numbers than the telemarketers can handle, some of the calls are disconnected. The consumer may hear silence on the line as the call is being transferred or a "click" as the call is disconnected.

2002 FCC Order, ¶ 26 (footnote omitted).

25. The 2002 FCC Order identified why "computerize calls" annoy citizens:

> "Computerized calls are the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall . . . [O]wning a telephone does not give the world the right and privilege to assault the consumer with machine-generated telephone calls." 137 CONG. REC. S9874 (July 8, 1991)(statement of Sen. Hollings).

2002 Order, fn. 90.

26.     The Court may take judicial notice that the FCC released a Declaratory Ruling on January 4, 2008 ("2008 FCC Ruling").   A copy of the 2008 FCC Ruling can be found at

https://apps.fcc.gov/edocs_public/attachmatch/FCC-07-232A1.pdf

27.     The 2008 FCC Ruling "affirm[ed] that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers." 2008 FCC Ruling at ¶ 12.

28.     The 2008 FCC Ruling states that it "first sought comment on predictive dialers in 2002 and asked whether using a predictive dialer is subject to the TCPA's autodialer restrictions." See, 2008 FCC Ruling at ¶ 13.

29.     The 2008 FCC Ruling described the 2002 FCC Order as follows:

The Commission found that, based on the statutory definition of "automatic telephone dialing system," the TCPA's legislative history, and current industry practice and technology, a predictive dialer falls within the meaning and definition of autodialer and the intent of Congress. The Commission noted that the evolution of the teleservices industry had progressed to the point where dialing lists of numbers was far more cost effective, but that the basic function of such dialing equipment, had not changed—the capacity to dial numbers without human intervention. The Commission noted that it expected such automated dialing technology to continue to develop and that Congress had clearly anticipated that the FCC might need to consider changes in technology.

2008 FCC Ruling at ¶ 13 (footnotes omitted).

30.     "A predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists [caller] in predicting when an [agent] will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." *Meyer v. Portfolio Recovery Associates, LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012).

31.     The 2008 FCC Ruling states that "creditors and debt collectors may use predictive dialers to call [cellular] phones," if "the [cellular] phone number was provided by the subscriber in connection with the existing debt." 2008 FCC Ruling at ¶ 14.

32.     The 2008 FCC Ruling states that creditors are "responsible for demonstrating that the consumer provided prior express consent."

33.     According to 2008 FCC Ruling:

To ensure that creditors and debt collectors call only those consumers who have consented to receive autodialed and prerecorded message calls, we conclude that the creditor should be responsible for demonstrating that the consumer provided prior express consent. The creditors are in the best position to have records kept in the usual course of business showing such consent, such as purchase agreements, sales slips, and credit applications. Should a question arise as to whether express consent was provided, the burden will be on the creditor to show it obtained the necessary prior express consent.

2008 FCC Ruling, ¶ 10 (footnote omitted).

**FACTS SUPPORTING CAUSE OF ACTION**

34.     In May 2013, Plaintiff financed a vehicle ("subject vehicle") for purchase through Ally, incurring debt ("subject debt") as a result.

35.     Plaintiff fell behind on paying the subject debt.

36.     Plaintiff attempted to work out payment arrangements with Ally.

37.     Ally declined to work out a payment plan with Plaintiff.

38.     The subject vehicle was eventually repossessed.

39.     On June 3, 2014, Plaintiff paid $310.00 to release the vehicle from impound.

40.     Plaintiff's cellular telephone number is (312)520-2869.

41.     Plaintiff has always been the sole subscriber, owner, possessor, and operator of his cellular number.

42.     Plaintiff paid for his cellular phone.

43.     Plaintiff subscribes to and pays a cellular service provider to obtain cellular services.

44.     In or around October 2013, Ally began placing calls to Plaintiff's cellular number.

45.     In or around November 2013, Plaintiff answered a phone call from Ally attempting to collect the subject debt.

46.     When this call from Ally connected, there was dead air (silence) followed by an audible click and a long pause before an Ally customer service representative spoke.

47.     Many times when Plaintiff answered a call from Ally he had to ask "hello?" multiple times before an Ally customer service representative spoke.

48.     During the November 2013 telephone call, Plaintiff spoke with an Ally customer service representative.

49. During this conversation, Plaintiff customer service representative to stop calling him.

50. Plaintiff was unable to keep up with the payments towards the subject debt.

51. Plaintiff traded in the subject vehicle in January 2015.

52. At the time Plaintiff traded in the subject vehicle, he received $17,000 through the trade in value of the subject vehicle.

53. Of the $17,000 received through the trade-in of the subject vehicle, $14,878.20 of that amount was paid to Ally.

54. Plaintiff's tender of $14,878.20 to Ally fully satisfied the subject debt.

55. Plaintiff's trade in of the subject vehicle and his tender of $14,878.20 to Ally fully satisfied the subject debt.

56. Ally continued placing calls to (312)520-2869 after January 2015.

57. Ally continued placing calls to (312)520-2869 after January 2015 in an effort to collect money allegedly towards the subject debt.

58. Ally's phone records will show that it called a (312)520-2869) after January 2015.

59. Ally's phone records will show that it called a (312)520-2869) after January 2015 in an effort to collect money allegedly towards the subject debt.

60. Ally continued to call (312)520-2869 after January 2015 for the purpose of demanding payment in the amount of $1,300.45 for the subject debt.

61. Ally continued placing calls to Plaintiff's cellular phone after January 2015 demanding payment in the amount of $1,300.45 for the subject debt despite the fact that Plaintiff had traded in the subject vehicle and satisfied the subject debt.

8

62. On information and belief, all of the calls were placed with an ATDS as defined by 47 U.S.C. §227(a)(1).

63. Alternatively, on information and belief, all of the calls were placed with a predictive dialer as defined by the FCC.

64. Upon information and belief, the predictive dialing system employed by Ally transfers the call to a live agent once a human voice is detected, thus resulting in a pause after the called party speaks into the phone.

65. Ally's account records will show that Plaintiff answered some of the calls.

66. Plaintiff repeatedly informed Ally that the subject debt was paid off and further demanded that Ally cease placing calls to his cellular phone.

67. A majority off the calls placed by (312)520-2869 during 2015 to the present resulted in dead air (silence) followed by an audible click and a long pause before an Ally customer service representative spoke.

68. Further, on many occasions when Plaintiff answered a call from Ally he had to ask "hello?" multiple times before an Ally customer service representative spoke.

69. In the case of *Donald Tillman v. Ally Financial Inc*., 16-cv-00313-UA-CM (M.D. Fla.), Ally has admitted to using a Sykes Dialer, which it described as "ASPECT; Model Number: Unified IP; Software: Aspect Proprietary applications, Windows 2003 R2, RedHat 5.0, Oracle Unbreakable LINUX, Sybase; Version: 6.6 SP2." See, *Tillman*, ECF Doc. 175-2.

70. In the case of *Donald Tillman v. Ally Financial Inc*., 16-cv-00313-UA-CM (M.D. Fla.), Ally admitted to using Soundbite Dialer, which it described as "Soundbite Engage; Version: 8.7.1.0 version of the platform." *See, Tillman*, ECF Doc. 175-2.

71.     In light of the frequency of the calls, Ally utilized an ATDS, as defined by 47 U.S.C. §227(a)(1), to place the calls.

72.     The above allegations, in conjunction with the admissions set forth in *Tillman v. Ally*, plausibly demonstrate that calls was placed using ATDS as defined by 47 U.S.C. §227(a)(1).

73.     Alternatively, the above allegations, in conjunction with the admissions set forth in *Tillman v. Ally*, plausibly demonstrate that calls was placed using an predictive dialer as defined by the FCC.

74.     During some of the calls Plaintiff received from Ally after January 2015,  Plaintiff was greeted with a prerecorded voice message rather than a live representative.

75.     During some of the calls Plaintiff received from Ally after January 2015, Plaintiff was greeted with a artificial voice message rather than a live representative.

76.     Ally's records will demonstrate when prerecorded voice messages were played on calls it placed to (312)520-2869 after January 2015

77.     Ally's records will demonstrate when artificial voice messages were played on calls it placed to (312)520-2869 after January 2015

78.     In the case of *Donald Tillman v. Ally Financial Inc*., 16-cv-00313-UA-CM (M.D. Fla.), Ally provided the following answer when asked to identify codes related to prerecorded messages:

> As to information pertaining to the identification of pre-recorded calls generally, the following codes are used for prerecorded voice calls as it pertains to calls by the vendors at issue: DSLA, DSLM, DSPP, DSRP, DSTR, and DSWP. Additionally, DGAM may also refer to a pre-recorded message when used by Sykes.

*See, Tillman*, ECF Doc. 175-2.

79.     Plaintiff demanded that Ally cease placing calls to his cellular phone on no less than 4 separate occasions.

10

80.     On information and belief, in 2015 and 2016, Ally's call representatives were trained to document do not call request in account notes.

81.     On information and belief, in 2015 and 2016, Ally's call representatives were not trained to document do not call request in account notes.

82.     On information and belief, in 2017, Ally's call representatives were trained to document do not call request in account notes.

83.     On information and belief, in 2017, Ally's call representatives were trained to ignore do not call request in account notes.

84.     Notwithstanding Plaintiff's requests that Ally's collection calls cease, Ally placed or caused to be placed no less than 365 phone calls to Plaintiff's cellular phone, (312)520-2869, between November 2013 through December 2016.

85.     The number that Ally called, (312)520-2869,  was assigned to cellular services for which Plaintiff incurs a charge for incoming calls pursuant to 47 U.S.C. §227(b)(1).

86.     The calls Ally placed to (312)520-2869 were not placed for emergency purposes pursuant to 47 U.S.C. §227(b)(1)(A)(i).

87.     Ally's call records demonstrate that Plaintiff told an Ally call representative that he did not owe the subject debt.

88.     Ally's call records demonstrate that Plaintiff told an Ally call representative that did not want Ally calling him any more.

89.     Ally's call records demonstrate that Plaintiff told an Ally call representative to stop calling him.

90. When Plaintiff spoke with an Ally call representative and told an Ally call representative to stop calling him, the representative, on information and belief, typed a specific numeric code to document Plaintiff's request.

91. If a numeric code was used to document Plaintiff's request, the code was entered by the representative in Ally's account records for the subject debt.

92. If a numeric code was used to document Plaintiff's request, Ally's records would show the total amount of calls placed after the stop calling requested was coded.

93. If a numeric code was used to document Plaintiff's request the code was entered by the representative in Ally's account records for the subject debt, the same code would be searchable across Ally's entire database of debts.

94. If a numeric code was used to document Plaintiff's request, the code would be searchable across Ally's entire database of debts, resulting in the identification of hundreds of similarly situated consumers who told Ally to stop calling.

95. If a numeric code was used to document do not call requests made by other persons, a search of the code in Ally's records would show the total amount of calls placed after the stop calling requested was coded.

96. When Plaintiff spoke with an Ally call representative and told an Ally call representative to stop calling him, the representative, on information and belief, typed a specific alpha (letter) code to document Plaintiff's request.

97. If an alpha (letter) code was used to document Plaintiff's request the code was entered by the representative in Ally's account records for the subject debt.

98. If an alpha (letter) code was used to document Plaintiff's request, the same code would be searchable across Ally's entire database of debts.

99.    If an alpha (letter) code was used to document Plaintiff's request, the code would be searchable across Ally's entire database of debts, resulting in the identification of hundreds of similarly situated consumers who told Ally to stop calling.

100.    In an alpha (letter) was used to document do not call requests made by other persons, a search of the code in Ally's records would show the total amount of calls placed after the stop calling requested was coded.

101.    When Plaintiff spoke with an Ally call representative and told an Ally call representative to stop calling him, the representative, on information and belief, typed Plaintiff's request into the account notes field of associated with the subject debt.

102.    If a call representative typed Plaintiff's stop calling request into the account notes field of associated with the subject debt, Ally's records would show the total amount of calls placed after the stop calling requested was documented.

103.    If a call representative typed Plaintiff's stop calling request into the account notes field of associated with the subject debt, Ally would be able to search the notes fields of other persons to locate similar stop calling notations.

104.    If a call representative typed Plaintiff's stop calling request into the account notes field of associated with the subject debt, Ally would be able to search the notes fields of other persons, resulting in the identification of hundreds of similarly situated consumers who told Ally to stop calling.

105.    If a call representative typed Plaintiff's stop calling request into the account notes field of associated with the subject debt, a search of Ally's records would show the total amount of calls placed after the stop calling request was documented in the notes field of the subject debt.

13

### PLAINTIFF HAS SUFFERED A PARTICULARIZED AND CONCRETE INJURY CONSISTENT WITH THE STATUTORY PURPOSE FOR ENACTING THE TCPA

106.    Plaintiff has suffered and continues to suffer from emotional distress, mental anguish, and anxiety as a direct result of Ally's unlawful collection practices.

107.    Ally's harassing phone calls have severely disrupted Plaintiff's daily life and general well-being.

108.    Ally's phone calls have caused Plaintiff actual harm, including but not limited to, physical harm, invasion of privacy, aggravation that accompanies unsolicited telephone calls, emotional distress, mental anguish, increased risk of personal injury due to the distraction caused by the phone calls,

109.    Ally's phone calls have diminished the value and utility of Plaintiff's telephone equipment and telephone subscription services.

110.    Ally's phone calls have caused unnecessary usage (wear and tear) to Plaintiff's cellular telephone.

111.    Ally's phone calls have reduced the battery life of Plaintiff's phone.

112.    Concerned about the violations of his rights and invasion of his privacy, Plaintiff sought the assistance of counsel to cease Ally's collection tactics, incurring costs and expenses traveling to and from his attorney's office.

113.    In enacting the TCPA, Congress made specific findings that "unrestricted telemarketing can be an intrusive invasion of privacy" and are a "nuisance." Telephone Consumer Protection Act of 1991, Pub. L. 102–243, § 2, ¶¶ 5, 10, 12, 13, 105 Stat. 2394 (1991); *see also Mims v. Arrow Fin*. Servs., LLC, 132 S. Ct. 740, 745 (2012).

14

114.    As the Supreme Court has explained, Congress has the power to enact laws to elevate concrete harm "to the status of legally cognizable injuries." *Spokeo, Inc., v. Robbins*, 136 S. Ct. 1540, 1549 (2016). "Congress is well positioned to identify intangible harms that meet minimum Article III requirements." *Id*. "[B]oth history and the judgment of Congress play important roles" in deciding whether a statutory violation is a concrete, de facto injury." *Id*.

115.    In enacting the TCPA, Congress sought to protect consumers from the unwanted intrusion and nuisance.

116.    The session law for the TCPA itself stated: "Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." Id.

117.    Actions to remedy a defendant's invasions of privacy, intrusion upon seclusion, and nuisance have long been heard by American courts, and the right of privacy is recognized by most states. See Restatement (Second) of Torts § 652(B) (Am. Law Inst. 1977).

118.    The TCPA establishes the substantive right to be free from certain types of phone calls and texts absent consumer consent. Congress identified unsolicited contact as a concrete harm, and gave consumers a means to redress this harm.

119.    Courts have held that TCPA alleged demonstrate concrete and legally cognizable harm. *See, e.g., Susinno v. Work Out World Inc.*, 862 F.3d 346, 348 (3d Cir. 2017) (holding that Article III standing existed where a TCPA plaintiff received a a "single solicitation" to her cell phone from a fitness company that resulted in the "receipt of [a] call and voicemail"); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (finding two unwanted text

15

messages constituted a concrete injury under the TCPA, as they "present the precise harm and infringe the same privacy interests Congress sought to protect"); *Etzel v. Hooters of Am., LLC*, 223 F. Supp. 3d 1306, 1311, 1312 (N.D. Ga. 2016) (rejecting application of *de minimis* rule to "a lone text message after withdrawal of consent" (internal quotation marks omitted) given "the [unambiguous] language of the TCPA . . . that a violation can occur from a single call" under § 227(b)(1)(A) in contrast to § 227(c)(5) which requires more than one call); *Cabiness v. Educ. Fin. Solutions, LLC*, 2016 U.S. Dist. LEXIS 142005, 2016 WL 5791411, at *5-6 (a violation of the TCPA "is sufficient on its own to constitute an injury in fact" because "[e]very unconsented call through the use of an ATDS to a consumer's cellular phone results in actual harm"); *Cour v. Life360, Inc.*, 2016 U.S. Dist. LEXIS 98945, 2016 WL 4039279, at *2 (N.D. Cal. July 28, 2016) (finding concrete injuries where plaintiff alleged he received one text message in violation of the TCPA); *Meyer v. Bebe Stores, Inc.*, 2015 U.S. Dist. LEXIS 12060, 2015 WL 431148, at *2 (N.D. Cal. Feb. 2, 2015) (finding concrete injuries based on one alleged violation of the TCPA); *Smith v. Microsoft Corp.*, No. 11-CV-1958 JLS (BGS), 2012 U.S. Dist. LEXIS 101197, 2012 WL 2975712, at *6 (S.D. Cal. July 20, 2012) (finding "that by alleging he received a text message in violation of the TCPA, [plaintiff] has established a particularized injury in satisfaction of Article III premised on the invasion of his privacy"); *Hossfeld v. Compass Bank*, 2017 U.S. Dist. LEXIS 182571, *14-15 (N.D. Al. Nov. 3, 2017) ("Mr. Hossfeld has undoubtedly cleared the particularity hurdle and asserted a personal connection to the harm claimed that is sufficient to establish this prong of the standing requirement. The two unsolicited calls described in Ms. Hossfeld's first amended complaint were made to his personal cell phone number. (Doc. 12 at 4 ¶ 17). Mr. Hossfeld further alleges how those automatically-dialed calls impacted him personally—

they temporarily deprived him from being able to use his cell phone, invaded his privacy, wasted his time, and reduced his cell phone's battery's life. (Doc. 12 at 7 ¶ 40)."

## THE ELEMENTS OF FRCP 23 ARE SATISFIED

120.    The proposed class members can be identified through Defendants' records.  *See, e.g., In re Community Bank of Northern Virginia Mortg. Lending Practices Litigation*, 795 F.3d 380, 397 (3d Cir. 2015) (finding that the plaintiff's proposed class was ascertainable because the defendant "possesse[d] all of the relevant bank records needed to identify the putative class members").

121.    For example, Ally's records can and will be used identify the putative class members because Ally's records identify the times and dates of calls (for a period of four years prior to the filing of this civil action for the TCPA claims, and for a period of one year prior to of this civil action for the FDCPA claims), the type of call (in-bound and out-bound), the disposition of the call (recorded message left on a person's voice mail, live connection or no contact) and related notations in Defendants' records (do not call requests).

122.    The proposed classes are also ascertainable because are commercially available applications and program which can identify whether telephone number have always been identified as cellular numbers, or alternatively, when a particular residential/landline telephone number was "ported" (turned into/converted to) a cellular telephone number.

123.    Excluded from the proposed class(es) are counsel for the parties, Defendants' employees and agents, any Judge to whom this action is assigned, and any member of the Judge's staff and immediate family.

124.    Numerosity is satisfied because Ally made autodialed or predictively dialed calls to persons after Ally was told to stop calling.

125. Numerosity is also satisfied because AFI and/or ASL (a) used pre-recorded and/or artificial voice messages when calling persons who were not the debtor that AFI and/or ASL was trying to call (b) after AFI was told that the person it had reached did not know the person AFI and/or ASL was trying to call and/or (c) where the person that AFI and/or ASL had reached told AFI and/or ASL to stop calling him/her.

126. AFI and/or ASL contacted over 40 persons in the manner outlined above.

127. The joinder of all members of the Class is impracticable. While the exact number of Class members is presently unknown, the persons called by Ally can be ascertained through discovery, and Plaintiff believes there are hundreds and possibly thousands of Class members based upon Defendants' representations regarding the scope of their business.

128. Commonality and predominance are satisfied because Ally acted in a common manner toward Plaintiff and the proposed class members by calling persons utilizing a prerecorded or artificial where the call was placed after Ally was told to stop calling

129. There are several questions of law and fact common to the claims of Plaintiff and the proposed class members such as (a) whether Ally called Plaintiff and the proposed class members with an autodialer and/or predictive dialer, (b) whether Ally called Plaintiff and the proposed class members utilizing pre-recorded and/or artificial messages, (c) whether Ally ignored consumers who told Ally stop calling, and (e) whether Ally n continuing to Plaintiff and others after being told to stop calling constitutes part of a pattern of noncompliance with the TCPA to support the imposition of treble damages.

130. These common questions predominate over any potential individual issues.

131. Plaintiff's claims are typical of the claims of the proposed class members, claims all arise from the same operative facts and are based on the same legal causes of action, which are

(a) that Ally used a similar autodialer or predictive dialer system to place calls placed to Plaintiff's cellular phone and the cellular phones of the proposed class members, (b) that Ally used similar pre-recorded or artificial voice messages when Ally called Plaintiff's cellular phone and the cellular phones of the proposed class members, (c) that Ally continued to call Plaintiff's cellular phone and the cellular phones of the proposed class members despite Ally being told to stop calling and (d) that Ally continued to call Plaintiff's cellular phone and the cellular phones of the proposed class members despite being told to stop calling.

132.    Common questions of proof predominate over any potential individual issues.

133.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has no interest antagonistic to those of the Class and Defendants do not have any defenses unique to Plaintiff.

134.    Plaintiff's lead attorney (James C. Vlahakis) is an experienced consumer class action litigator who has defended over a hundred consumer-based claims.

135.    Mr. Vlahakis has defended TCPA class actions since 1998.

136.    Mr. Vlahakis has litigated over three dozen TCPA based putative class actions.

137.    In conjunction with counsel for the class members, Mr. Vlahakis obtained Court approval has obtained approval of various TCPA class actions. *See, e.g., In Re Capital One Telephone Consumer Protection Act Litigation*, 2012-cv-10064 (N.D. Ill.) ($75 million dollar ATDS based settlement); *Prater v. Medicredit, Inc.*, 2014-cv-0159 ($6.3 million dollar ATDS wrong party settlement); *INSPE Associates v. CSL Biotherapries, Inc*. (N.D. Ill.) ($3.5 million fax based settlement).

138.    Based upon nearly twenty years of experience, Mr. Vlahakis understands the defense typically utilized by creditors and debt collectors in TCPA litigation.

139.    For example, Mr. Vlahakis has successfully defeated a TCPA based class certification motion in *Jamison v. First Credit Services, Inc.*, 290 F.R.D. 92 (N.D. Ill. Mar. 28, 2013), reconsideration denied, 2013 U.S. Dist. LEXIS 105352 (N.D. Ill. July 29, 2013).

140.    As an additional example, Mr. Vlahakis also decertified a previously certified TCPA class action in *Pesce v. First Credit Services, Inc.*, 2012 U.S. DIst. LEXIS 188745 (N.D. Ill. June 6, 2012).

141.    Additionally, Mr. Vlahakis (as a former consumer class action defense attorney) has gained court approval of dozens of numerous FDCPA class actions.

142.    As a former consumer class action defense attorney, Mr. Vlahakis has a vast level of knowledge which will assist him in advocating for Plaintiff and the putative class members. Additionally, Mr. Vlahakis has successfully ascertained the identities of putative class members individually and in conjunction with industry experts.

143.    Finally, to the extent this case necessitates action before the Federal Communications Commission by way to petitions for declaratory relief, Mr. Vlahakis has filed two petitions for declaratory relief before the Federal Communications Commission.

144.    Plaintiff's other counsel are highly competent and experienced class action attorneys.

145.    In summary, a class action is an appropriate method for the fair and efficient adjudication of this controversy, and superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and fact enumerated above predominate over questions affecting only individual Class members.

146. The likelihood that individual Class members will prosecute separate actions is remote due to the extensive time and considerable expense necessary to conduct such litigation, as well as the absence of a fee shifting mechanism.

### COUNT I – VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT
### FOR AUTODIALED AND/OR PREDICTIVELY DIALED CALLS WITHOUT CONSENT

147. Plaintiff restates and realleges paragraphs 1 through 142 as though fully set forth herein.

148. Ally violated the TCPA by placing no less than 365 calls between November 2013 through December 2016 to Plaintiff's cellular phone, using an ATDS or a predictive dialer after Plaintiff demanded that Ally cease placing calls to his cellular phone on no less than four separate occasions.

149. As pled above, Plaintiff was harmed by Ally's collection calls to his cellular phone.

150. Ally called more than forty persons with an ATDS or a predictive dialer after they told Ally to stop calling them.

151. Ally knew its collection techniques were in violation of the TCPA, yet continued to employ them to increase profits at Plaintiff's expense.

152. The proposed class can be defined as: All persons in the United States (a) whose cellular telephone number were called by Ally (b) within four years of the filing of this civil action (c) where Ally's calls were made by an automated telephone dialing system, predictive dialer or some other technology what has been declared unlawful by the FCC.

153. Because Defendant bears the burden of proof on whether it had consent to call Plaintiff and the proposed class members, the above proposed class definition does not contain the reference to whether Defendant had consent to call the cellular numbers in the manner described

in the above paragraphs. Further, because Defendant bears the burden of proof on whether it had consent to call Plaintiff and the proposed class members, the above proposed definition is not defined to reference revocation of consent.

154. Ally, through its agents, representatives and/or employees acting within the scope of their authority acted intentionally in violation of 47 U.S.C. §227(b)(1)(A)(iii).

155. Pursuant to 47 U.S.C. §227(b)(3)(B), Ally is liable to Plaintiff for a minimum of $500 per call. Moreover, pursuant to 47 U.S.C. §227(b)(3)(C), Ally's willful and knowing violations of the TCPA should trigger this Honorable Court's ability to triple the damages to which Plaintiff is otherwise entitled to under 47 U.S.C. §227(b)(3)(C).

WHEREFORE, Plaintiff DONALD DOYLE requests that this Honorable Court:

a. Declare Ally's phone calls to Plaintiff to be violations of the TCPA;

b. Declare Ally's phone calls to similarly situated class members to be violations of the TCPA;

c. Award Plaintiff and class members damages of at least $500 per phone call and treble damages pursuant to 47 U.S.C. § 227(b)(3)(B)&(C); and

d. Award any other relief this Honorable Court deems equitable and just.

## COUNT II – VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT
## FOR PRERECORDED OR ARTIFICIAL VOICE MESSAGES WITHOUT CONSENT

156. Plaintiff restates and realleges paragraphs 1 through 149 as though fully set forth herein.

157. Ally violated the TCPA by playing prerecorded and/or artificial voice messages during calls that it placed to Plaintiff after he demanded that Ally cease placing calls to his cellular phone on no less than four separate occasions.

158. As pled above, Plaintiff was harmed by Ally's collection calls to his cellular phone.

159. Ally called more than forty persons with an ATDS or a predictive dialer after they told Ally to stop calling them.

160. Ally knew its collection techniques were in violation of the TCPA, yet continued to employ them to increase profits at Plaintiff's expense.

161. The proposed class can be defined as: All persons in the United States (a) whose cellular telephone number were called by ASL (b) within four years of the filing of this civil action (c)where ASL's calls included artificially created voices, prerecorded messages, or electronic messages created before the phone calls took place.

162. Because Defendant bears the burden of proof on whether it had consent to call Plaintiff and the proposed class members, the above proposed class definition does not contain the reference to whether Defendant had consent to call the cellular numbers in the manner described in the above paragraphs. Further, because Defendant bears the burden of proof on whether it had consent to call Plaintiff and the proposed class members, the above proposed definition is not defined to reference revocation of consent.

163. Ally, through its agents, representatives and/or employees acting within the scope of their authority acted intentionally in violation of 47 U.S.C. §227(b)(1)(A)(iii).

164. Pursuant to 47 U.S.C. §227(b)(3)(B), Ally is liable to Plaintiff for a minimum of $500 per call. Moreover, pursuant to 47 U.S.C. §227(b)(3)(C), Ally's willful and knowing

violations of the TCPA should trigger this Honorable Court's ability to triple the damages to which Plaintiff is otherwise entitled to under 47 U.S.C. §227(b)(3)(C).

WHEREFORE, Plaintiff DONALD DOYLE requests that this Honorable Court:

a. Declare Ally's prerecorded and/or artificial messages to Plaintiff to be violations of the TCPA;

b. Declare Ally's prerecorded and/or artificial messages to similarly situated class members to be violations of the TCPA;

c. Award Plaintiff and class members damages of at least $500 per message and treble damages pursuant to 47 U.S.C. § 227(b)(3)(B)&(C); and

d. Award any other relief this Honorable Court deems equitable and just.

## COUNT III - VIOLATIONS OF 47 CFR 64.1200(B)(1)

165. Plaintiff restates and realleges paragraphs 1 through 156 as though fully set forth herein.

166. Plaintiff is bringing this Count on behalf of himself and a nationwide class of similarly situated persons who were called by AFI in violation of 47 CFR 64.1200(b)(1).

167. 47 CFR 64.1200(b)(1) requires that all artificial or prerecorded voice telephone messages must identify the full legal name of the party initiating the call.

168. The FCC was authorized to enact 47 CFR 64.1200(b)(1) pursuant to Section 227(b)(2) of the TCPA which provides that the FCC "shall prescribe regulations to implement the requirements of this subsection."

169. 47 CFR 64.1200(b)(1) states:

24

> At the beginning of the message, state clearly the identity of the business, individual, or other entity that is responsible for initiating the call. If a business is responsible for initiating the call, the name under which the entity is registered to conduct business with the State Corporation Commission (or comparable regulatory authority) must be stated[.]

170. On information and belief, the artificial or prerecorded voice messages played by AFI during calls to Plaintiff did not contain AFI's legal name, Ally Financial, Inc.

171. Consent or revocation of consent is not an element of a claim brought pursuant to 47 CFR 64.1200(b)(1).

172. Section 227(b)(3) provides a private right of action for violations of the TCPA and the FCC's regulations.

173. The proposed class is defined as: All persons in the United States (a) whose cellular telephone number were called by Ally (b) where Ally's calls included artificially created voices, prerecorded messages, or electronic messages created before the phone calls took place and (c) the messages did not comply include Ally's legal name as registered in the 50 United States.

174. The class is ascertainable because Ally's documents when it leaves artificial and prerecorded voice messages with consumers and its records identify the particular message left, include the name used for Ally.

175. AFI's violations of 47 CFR 64.1200(b)(1) renders it liable for a minimum of $500 per call and up to $1,500 for each artificial or prerecorded voice message where AFI's legal name, Ally Financial, Inc., was not included in the message.

WHEREFORE, Plaintiff DONALD DOYLE requests that this Honorable Court:

a. Declare Ally's prerecorded and/or artificial messages to Plaintiff to be violations of 47 CFR 64.1200(b)(1);

b.     Declare Ally's prerecorded and/or artificial messages to similarly situated class members to be violations of 47 CFR 64.1200(b)(1);

c.     Award Plaintiff and class members damages of at least $500 per unlawful message and treble damages pursuant to 47 U.S.C. § 227(b)(3)(B)&(C); and

d.     Award any other relief this Honorable Court deems equitable and just.

## COUNT IV – VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT ("IFCFA")

176.     Plaintiff restates and realleges paragraphs 1 through 175 as through fully set forth herein.

177.     The IFCFA states:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

> 815 ILCS 505/2.

178.     Plaintiff is a "person" and a "consumer" as defined in ICFA, 815 ILCS 505/ (c) and (e) respectively.

179.     Ally is engaged in commerce in the State of Illinois with regard to Plaintiff. Ally specializes offering credit services and debt collection, which are an activities within the stream of commerce and utilized in its regular course of business.

180.     Ally violated 815 ILCS 505/2 by engaging in unfair acts in its attempts to collect the subject debt from Plaintiff.

26

181.    It was unfair for Ally to seek to collect from Plaintiff the subject debt through relentless harassing phone calls to his cellular phone attempting to induce him into making a payment.

182.    It was unfair for Ally to place or cause to be placed no less than 365 phone calls to Plaintiff's cellular phone between November 2013 through December 2016, without his consent.

183.    It was unfair for Ally to continue placing calls to Plaintiff after he demanded that the calls cease on no less than four separate occasions.

184.    Ally's unfair conduct is inherently oppressive as Plaintiff had no choice but to submit to the relentless harassing phone calls to his cellular phone.

185.    Moreover, Ally's unfair conduct is against public policy because it needlessly subjects consumers harassing calls, resulting in significant harm in the form of invasion of privacy.

186.    Upon information and belief, Ally systematically places unsolicited and harassing phone calls to consumers in Illinois in order to aggressively collect debts in default to increase its profitability at the consumers' expense.

187.    Upon information and belief, placing unsolicited and harassing phone calls to Illinois consumers is an unfair business practice willfully employed by Ally and is done on a large scale.

188.    Moreover Ally's unlawful and unfair debt collection efforts gives it an unfair competitive advantage over businesses that collect lawfully (companies who legally place calls with prior consent, as authorized, and who lawfully cease calling upon requests to stop).

189.    As alleged above, Plaintiff was substantially harmed by Ally's misconduct.

190.    Similarly, the proposed class members were harmed in an identical and/or similar manner.

27

191.    The proposed class can be defined as:  All Illinois Residents (a) whose cellular telephone number were called by Ally (b) within three years of the filing of this civil action (c) where Ally's calls were made by an automated telephone dialing system, predictive dialer or some other technology what has been declared unlawful by the FCC or (d) Ally's calls included artificially created voices, prerecorded messages, or electronic messages created before the phone calls took place and/or (e) the messages did not comply include Ally's legal name as registered in the 50 United States.

192.    An award of punitive damages is appropriate because Ally's conduct described above was outrageous, willful and wanton, showed a reckless disregard for the rights of Plaintiff and consumers, generally, and Plaintiff had no choice but to submit to the innumerable phone calls.

WHEREFORE, Plaintiff DONALD DOYLE requests that this Honorable Court:

a.    Enter judgment in the classe favor and against Ally;

b.    Award damages in an amount to be determined at trial;

c.    Award punitive damages in an amount to be determined at trial;

d.    Award Plaintiff his reasonable attorney's fees and costs pursuant to 815 ILCS 505/10a(c); and

e.    Award any other relief this Honorable Court deems equitable and just.

**Plaintiff demands trial by jury.**

Dated: November 30, 2017

Respectfully Submitted,


/s/ James Vlahakis
James Vlahakis
*Lead Counsel for Plaintiff*
Sulaiman Law Group, Ltd.
2500 South Highland Avenue, Suite 200
Lombard, IL 60148
(630)581-5456
jvlahakis@sulaimanlaw.com

*Additional Counsel*
Ahmad Sulaiman.
Omar Sulaiman
*Counsel for Plaintiff*
Sulaiman Law Group, Ltd.
2500 South Highland Avenue,
Suite 2500 Lombard, IL 60148